**Robert B. REICH, Secretary of Labor, United States Department of Labor, Petitioner,**

v.

**CON AGRA FLOUR MILLING CO.; Occupational Safety and Health Review Commission, Respondents.**

No. 93–2547.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1994.

Decided May 26, 1994.

---

Ronald Joseph Gottlieb, Washington, DC, argued (Barbara Werthmann, on the brief), for petitioner.

Dean G. Kratz, Omaha, NE, argued, for respondents.

Before McMILLIAN, WOLLMAN, and BEAM, Circuit Judges.

WOLLMAN, Circuit Judge.

Robert E. Reich, the Secretary of Labor (the "Secretary"), petitions for review of a decision and order of the Occupational Safety and Health Review Commission (the "Commission") that vacated the Secretary's citation against Con Agra Flour Milling Co. for violating 29 C.F.R. § 1910.178(c)(2)(vi)(a). We grant the petition and affirm the citation.

## I.

In the packing room of Con Agra's flour mill in Martin's Creek, Pennsylvania, flour is packaged in the following manner. A hopper is filled with six thousand pounds of flour. An auger chute connects the hopper to the bagging machine, located below the hopper. At the bagging machine, an employee slides an empty bag, with a capacity for either fifty or one hundred pounds of flour, onto a tube and then presses a foot pedal. Clamps close around the bag, and the auger chute fills the bag. The bag then travels in an upright position on a "V-conveyor," two small belts set at a "V" angle, to a work station, where an employee sews the bag closed. After the bag is sewed, it continues to the end of the V-conveyor and falls onto an inclined conveyor belt that runs perpendicular to the V-conveyor. On the inclined conveyor, the bag ascends from approximately two feet above the ground to ten feet, where it drops approximately one foot onto a level conveyor belt running perpendicular to the inclined conveyor. This conveyor transports the bag to a palletizer, which loads the bag onto a wooden pallet. At the palletizer, an employee loads bags that have been damaged during this process onto separate pallets.

Con Agra uses an electrically powered forklift truck, designated as an E truck, to bring pallets of empty bags to the bagging-machine area; to transport pallets of damaged bags from the palletizer to where flour is fed into the hopper; and to move pallets of full, undamaged bags to storage and delivery trucks.

On April 12, 1988, Donald Newell, a compliance officer for the Occupational Safety and Health Administration,[1] inspected the Martin's Creek packing room. He cited Con Agra for, among other things, using the type E forklift truck in the packing room, in violation of 29 C.F.R. § 1910.178(c)(2)(vi)(a). Con Agra contested the citation. An Administrative Law Judge held a hearing in June and November 1989 and affirmed the citation.

---

1. The Secretary has delegated certain statutory responsibilities to the Assistant Secretary for Oc-

cupational Safety and Health, who heads the Occupational Safety and Health Administration.

The Commission vacated the citation, however, and the Secretary then filed this petition for review.[2]

## II.

Title 29, section 1910.178 of the Code of Federal Regulations sets forth safety standards relating to the use of industrial trucks and tractors, including forklifts. 29 C.F.R. § 1910.178(a). More specifically, section 1910.178(b) establishes eleven designations of industrial trucks, including four designations of electrically powered trucks. E designated units "are electrically powered units that have minimum acceptable safeguards against inherent fire hazards." *Id.* § (b)(4). ES designated units have additional safeguards on the electrical system "to prevent emission of hazardous sparks and to limit surface temperatures." *Id.* § (b)(5). EE designated units have, in addition to all the safeguards on the E and ES units, "the electric motors and all other electrical equipment completely enclosed." *Id.* § (b)(6). EX designated units differ from the E, ES, and EE units "in that the electrical fittings and equipment are so designed, constructed and assembled that the units may be used in certain atmospheres containing flammable vapors or dusts." *Id.* § (b)(7). Trucks are so designated by a nationally recognized testing laboratory, such as Underwriter's Laboratories. *Id.* § (a)(7).

Section 1910.178(c) outlines which industrial truck designations may be used in various atmospheres, or types of locations. Section 1910.178(c)(2)(vi)(a) provides as follows:

> Only approved power operated industrial trucks designated as EX shall be used in atmospheres in which combustible dust is or may be in suspension continuously, intermittently, or periodically under normal operating conditions, in quantities sufficient to produce explosive or ignitable mixtures, *or where mechanical failure or abnormal operation of machinery or equipment might cause such mixtures to be produced.*

(emphasis added). The Secretary does not argue that the packing room is an atmosphere in which combustible dust is or may be in suspension under normal operating conditions, in quantities sufficient to produce explosive or ignitable mixtures. Rather, he contends that the packing room is an atmosphere in which mechanical failure or abnormal operation of machinery or equipment might cause such mixtures to be produced. The Secretary and Con Agra agree that section 1910.178(c)(2)(vi)(a) requires EX designated forklifts to be used in the packing room if the Secretary has established (1) that it is possible for machinery or equipment in the packing room to mechanically fail or to be abnormally operated[3] and (2) that such mechanical failure or abnormal operation might produce an explosive or ignitable concentration of flour dust.

The Commission vacated the citation because it believed that the Secretary had failed to show that operations in the packing room could cause an ignitable dispersal of dust. In reviewing the Commission's decision, we accept the Commission's factual findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a); *Con Agra, Inc. v. Occupational Safety & Health Review Comm'n,* 672 F.2d 699, 701 (8th Cir.1982). Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Con Agra,* 672 F.2d at 699. We consider not only the evidence supporting the Commission's factual findings, but also the evidence offered by the Secretary in opposition. *Id.*

The evidence establishes that it is possible for the equipment which regulates the flow of flour into the hopper to fail mechanically. James Smith, who has worked at the plant for more than fifteen years, testified that the hopper had overflowed due

**2.** The petition was filed with this court because Con Agra has its principal office in Omaha, Nebraska. 29 U.S.C. § 660(b).

**3.** The Secretary argues that he need not prove that machinery or equipment in a flour packing room may fail mechanically or be abnormally operated. Rather, he contends that it may be presumed that flour-packaging equipment, like all equipment, may fail mechanically. Because we find that the evidence establishes that it is possible for equipment in the packing room to malfunction, we need not decide whether this finding may be presumed.

to mechanical malfunction at least four times—the most recent time being within two years of his testimony. The Commission found, however, based upon the testimony of Wayne Bellinger, Con Agra's corporate-wide safety director, that prior to Newell's inspection Con Agra had taken effective measures to prevent the hopper from overflowing. Although Bellinger testified that Con Agra had installed safety devices to prevent an overflow from occurring, his testimony does not demonstrate that an overflow is no longer possible. Bellinger, who was not regularly present at the Martin's Creek mill, admitted that he was aware of only two of the four overflows about which Smith had testified. Thus he did not know the causes of all the overflows and whether the installed safety devices had remedied all potential problems. Indeed, although his testimony is not entirely clear, it appears that the safety mechanisms were in place when the last overflow occurred. In any event, Bellinger acknowledged that even with the additional safety devices, an overflow is still possible, although not very probable.

The evidence also demonstrates that a hopper overflow might produce an ignitable mixture of dust. Smith testified that on the occasions when the hopper overflowed the employees in the packing room had to phone employees in another building to have them turn off the flow of flour into the hopper, a process taking anywhere from a few seconds to approximately five minutes. According to Smith, in five minutes 3000 to 4000 pounds of flour would spill onto the packing room floor. The whole room would fill with dust and become cloudy, making it difficult for employees in the room to see and forcing them to leave for approximately thirty minutes.

John Nagy, a research physicist and expert in dust explosions who visited the packing room after the inspection, stated that .05 ounces of flour dust per cubic foot (50 grams per cubic meter) is the minimum concentration of dust needed to produce a fire or an explosion. He explained that at this concen-

tration level an illuminated light is not visible from a distance of 10 feet. Nagy testified that approximately 200 pounds of flour dust dispersed evenly throughout the packing room, which encompasses 3780 square feet, would create an ignitable and explosive concentration of dust. Nagy stated, however, that the entire room need not be filled with dust to cause a fire or an explosion. He testified that as little as five to ten pounds of suspended dust would be sufficient to produce a fire capable of seriously or fatally injuring an individual. Taken together, then, Smith's and Nagy's testimony establishes that a hopper overflow could produce an ignitable concentration of dust.[4]

The evidence further establishes that broken flour bags could produce an ignitable dispersal of dust. Newell and Nagy testified that bags could fall from the conveyor system and break. Indeed, Philip Ascani, who operated the forklift in the packing room, testified that he had observed bags fall off the inclined conveyor. Likewise, Smith testified that he had seen bags, as many as five at a time, fall from the elevated conveyor.

Nonetheless, relying on testimony from Ascani, the Commission found that Con Agra had corrected, before the inspection, the problem of bags falling from the conveyors. Ascani did testify that Con Agra had installed railings along the conveyors and had made adjustments to the conveyor system and that bags no longer fell from the conveyors. His testimony, however, does not establish that these changes were made prior to the inspection. He initially stated that the railings had been installed shortly after the inspection. He later stated that he did not know for sure whether bags were still falling from the conveyor system at the time of the inspection, but believed that they were not. Newell's and Nagy's testimony indicates, however, that railings were not in place when they visited the plant, for they would not have been so concerned about bags falling from the conveyors if railings had been in

---

4. Con Agra argues that for the Secretary to establish that a mechanical failure could cause an ignitable collection of dust, he must demonstrate that the forklift at issue here could serve as an ignition source. Section 1910.178(c)(2)(vi)(a) does not require such a showing, however. As the Commission stated, the regulation presumes that an electrically powered unit not designated as an EX unit can act as an ignition source.

place. Indeed, Nagy indicated that he was not aware that Con Agra had installed railings until he heard Ascani's testimony. Most telling, however, are photographs taken by Newell that clearly indicate that at the time of the inspection railings were not in place along the inclined conveyor or along the first section of the elevated conveyor. In light of this evidence, Ascani's equivocal testimony does not support the Commission's finding that Con Agra had taken measures before the inspection to ensure that bags did not fall from the conveyor system.

The evidence demonstrates also that bags falling from the conveyors could produce an ignitable mixture of dust. Smith testified that bags sometimes broke when they fell, spreading flour across the floor and creating a cloud of dust. He stated that one broken bag could produce a dust cloud that would rise approximately three feet and remain suspended for up to one minute. Nagy testified that under certain circumstances one broken bag could produce the five to ten pounds of suspended dust needed to cause a fire. Indeed, Bellinger admitted that one broken bag could produce an ignitable mixture of dust in a localized area.

We believe that the foregoing evidence satisfies the Secretary's burden of proof under section 1910.178(c)(2)(vi)(a). We therefore need not address the Secretary's evidence concerning additional malfunctions that might produce an ignitable mixture of dust.

■ . We briefly consider two arguments advanced by Con Agra but not addressed by the Commission. In 1984 the Secretary cited Con Agra for using the type E forklift in the packing room, but later vacated the citation. Con Agra argues that the current citation must be vacated because the Secretary's decision to vacate the earlier citation led Con Agra to believe that the forklift did not represent a hazard. The 1984 citation, however, involved a regulation other than section 1910.178(c)(2)(vi)(a), the one at issue here. That the Secretary decided to vacate a citation under one regulation does not give an employer reason to believe that it will not later be cited for violating a different regulation.

■ Con Agra also argues that 29 C.F.R. § 1910.178 is invalid because it improperly delegates to industrial truck manufacturers the authority to prescribe safety standards, contending that by attaching to a truck a designation label the manufacturer is setting safety standards. This argument is without merit. As stated above, in section 1910.178, the Secretary prescribes safety standards relating to the use of industrial trucks; the Secretary defines different types of trucks and outlines which types may be used in various atmospheres. A nationally recognized testing laboratory designates trucks in accordance with the Secretary's standards. This regulatory procedure does not delegate to testing laboratories or truck manufacturers any authority to set safety standards, for the testing laboratories merely apply the Secretary's prescribed standards, and the manufacturers merely attach the designation given by the laboratories.

The Secretary's petition for review is granted, the Commission's decision is reversed, and the citation for violating section 1910.178(c)(2)(vi)(a) is affirmed.