# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3968

_____

Omaha Paper Stock Company,     *
                                    *

Petitioner,     *
                                    *   On Petition for Review from an

v.     *   Order of the Occupational Safety
                                    *   and Health Review Commission.

Secretary of Labor,     *
                                    *

Respondent.     *

_____

Submitted: June 14, 2002

Filed: September 17, 2002

_____

Before RILEY, BEAM and MELLOY, Circuit Judges.

_____

BEAM, Circuit Judge.

In this enforcement action under Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq. (OSHA), Omaha Paper Stock Company (OPS) brings this petition for review of an order of the Occupational Safety and Health Review Commission (the Commission). The Commission found that OPS violated OSHA's permit-required confined spaces (PRCS) standard at its Cincinnati, Ohio, paper recycling and recovering facility. We affirm the Commission's order.

## I.     BACKGROUND

At its Cincinnati plant, OPS uses a Lindemann baler, which is thirty to forty feet long, to bale paper.  The baling process begins outside of the facility, where a lineman sorts through the paper to be baled and removes "contamination," such as plastic bottles and glass.  The paper is then pushed onto a conveyor belt and moved to the top of the baler, where it falls through a chute to the baler chamber, which is approximately six feet long and five feet wide.  Depending on the type of material being fed into the baler, a fluffer may be attached to the inside of the baler chamber. The fluffer swings on a hinge and has rotating blades that generate air to move the paper around inside the chamber.  Once a sufficient amount of paper has been placed inside the chamber, a bale is made and an OPS employee removes the bale with a forklift.

Christopher Tracy began working as a lineman for OPS on August 31, 1998. On September 18, 1998, while voluntarily working extended hours, Tracy heard the alarm that signals a jam in the baler.  Although Tracy was only trained to do the "outside job" of removing non-paper contaminants, and even though he had been told not to enter the baler chamber, he nevertheless climbed inside the chamber to clear the jam in the overhead chute.  Once the jam was dislodged, a great amount of paper fell onto him, knocked him to the floor of the chamber, and submerged him to the extent that he was unable to move his legs.  Tracy was discovered approximately fifteen minutes later by a supervisor, who called the local fire department.  The fire department extricated Tracy roughly an hour later.  The pile of paper on Tracy was estimated to be five or six feet deep and weighed approximately 150 to 225 pounds.

At the time of Tracy's accident, OPS had a lockout/tagout procedure in place for evaluating jams in the baler.  Once a paper jam was discovered, the employee operating the baler would turn the baler key to "off," remove the key and put it in his

or her pocket, inform the manager on duty, and put a "lockout"[1] on the main power source. At that point, the manager would assess the situation and determine the best way to clear the jam.

Tracy had only worked at the plant for approximately two weeks at the time of the accident, and had not been fully trained in the lockout/tagout procedure. Furthermore, Tracy did not normally work inside the plant near the baler, but, as indicated, worked outside as a lineman, clearing contamination from the conveyor belt before it moved the paper into the plant. But, because the Cincinnati facility was trying to catch up on some work, it staffed a small, temporary second shift, comprised of three employees on the day of Tracy's accident. As a result, Tracy performed tasks that were beyond the scope of his usual job. Tracy testified at the hearing that on the day of the accident, the baler had previously jammed and he had cleared the jams by reaching in and flipping paper off the fluffer arm. When the larger jam that caused the accident occurred, a more experienced employee on duty (but not a manager) looked at the jam and seemed to indicate that Tracy should enter the baler chamber to clear the jam by pulling the paper down. Consequently, Tracy entered the chamber and the accident ensued. Tracy testified that he had previously been told by management not to enter the baler chamber and that he knew, in hindsight, that it was "a stupid move" to climb into the baler chamber. The manager on duty at that time was busy operating another baler and did not know about the jam until she discovered Tracy caught in the baler chamber.

In November 1998, representatives of the Secretary of Labor conducted an inspection of the Cincinnati facility, and eventually issued a citation alleging fourteen violations of the PRCS standard, 29 C.F.R. § 1910.146, and the lockout/tagout standard, 29 C.F.R. § 1910.147. Following a hearing, the Administrative Law Judge (ALJ) vacated the alleged violations of the lockout/tagout standard, finding that such

---

[1]The term "lockout" apparently refers to a padlock-type of device.

-3-

failures had been caused by unpreventable employee misconduct. The ALJ affirmed eight violations of the PRCS standard, classified each violation as "serious," and assessed $2000 per violation for each of the eight violations. The Commission affirmed the ALJ's order but reduced the penalty to a total of $12,000 for all eight violations.

On appeal, OPS argues that the baler chamber is not a permit-required space and that even if it is, the violations which occurred here were not "serious" violations. OPS also contends that the Commission abused its discretion by not further reducing the penalties imposed by the ALJ.

## II.   DISCUSSION

In reviewing the Commission's order, we affirm those factual findings "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a); Reich v. Con Agra Flour Milling Co., 25 F.3d 653, 655 (8th Cir. 1994). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion. Reich, 25 F.3d at 655. We will uphold the Commission's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

As it was before the Commission, the central issue in this appeal is whether the Secretary has met his burden of showing that the baler chamber is a "permit-required confined space."  This term means a confined space that has one or more of the following characteristics:

> (1) Contains or has a potential to contain a hazardous atmosphere; (2) Contains a material that has the potential for engulfing an entrant; (3) Has an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or by a floor which slopes

downward and tapers to a smaller cross-section; or (4) Contains any other recognized serious safety or health hazard.

29 C.F.R. § 1910.146(b).

If a confined space is a PRCS, the employer responsible for the space can select and implement protective measures from a range of available options including: posting signs and permanently closing or barricading the space to prevent employee entry, 29 C.F.R. § 1910.146(c)(2), (3); authorizing employees to enter in accordance with a written PRCS program which meets specific requirements, 29 C.F.R. § 1910.146(c)(4); and reclassifying the space as a non-permit space by eliminating the hazards and documenting the basis for determining that those hazards have been eliminated, 29 C.F.R. § 1910.146(c)(7)(i)-(iii). It is clear that OPS has not barricaded the baler chamber or devised a written PRCS program. The arguments from the proceedings below focus on whether the lockout/tagout program eliminates the baler chamber hazards, thereby effectively reclassifying the space as a non-permit required space.

The Commission found that the baler chamber was a PRCS within the meaning of 29 C.F.R. § 1910.146(b)(4) (other recognized hazards), reasoning that employees entering the baler chamber are potentially exposed to two other recognized serious safety hazards–being struck and buried by overhead material (as was the case here), and being struck by the baler ram if the baler were to start up unexpectedly. The Commission rejected OPS's argument that its lockout/tagout program effectively eliminated these hazards. Furthermore, the Commission characterized the violations as serious because OPS knew it had not complied with the permit-space requirements, relying on its belief that the baler chamber was not a PRCS. We agree with the Commission that the baler chamber is a PRCS based on the standard set forth in 29 C.F.R. § 1910.146(b)(4).

The danger of being struck by overhead material is a recognized serious safety or health hazard, and the lockout/tagout program cannot be substituted for compliance with the PRCS standard. As previously noted, a space that would otherwise qualify as a PRCS cannot be reclassified as a non-permit confined space unless the employer has *eliminated* the potential hazards. 29 C.F.R. § 1910.146(c)(7)(i). The lockout/tagout procedure perhaps reduces the possibility of being struck by overhead material, but it certainly does not eliminate it. For instance, under the scenario in which Tracy's accident occurred, if he had followed the lockout/tagout procedure correctly, the manager on duty would have assessed the situation and determined how best to remove the paper jam, after the machine was locked out. While one would hope the manager would not send an employee into the six-by-five foot baler chamber to unleash one hundred fifty pounds of paper from an overhead chute into that space, the final course of action would have been the manager's judgment call. Furthermore, even the manager's action of leaning inside the chamber to evaluate the potential overhead danger is still considered "entering" the baler under the regulations because in so doing, the manager breaks the plane of an opening into a confined space. See 29 C.F.R. § 1910.146(b) (stating that "entry" occurs when any part of the entrant's body breaks the plane of an opening into the space). Thus, the lockout/tagout procedure itself exposes the manager to the overhead paper danger. Obviously then, the lockout/tagout procedure does not eliminate this hazard, and cannot be substituted for compliance with the PRCS standard.

The other serious safety or health hazard is the possibility of an employee getting caught in the baler chamber if the baler suddenly became energized and the baler ram started moving. As the Commission noted, OPS "does not dispute that its baler chamber poses an 'unexpected activation' hazard to any employee who enters it without first locking out and tagging the machine's energy source and that that hazard is both 'recognized' and 'serious' within the meaning of alternative (4) of the PRCS definition." Sec'y of Labor v. Omaha Paper Stock Co., 2001 O.S.H.R.C.

Docket No. 99-0353, slip op. at 5 n.7 (Nov. 1, 2001). OPS instead argues that the lockout/tagout procedure adequately addresses this hazard. But, like the overhead paper situation, this hazard is not eliminated by the lockout/tagout procedure. It *might* be eliminated, assuming the employee follows the procedure correctly and locks out the main power to the baler, but it is not completely[2] eliminated so as to qualify the baler chamber for reclassification as a non-permit required space under section 1910.146(c)(7). We therefore affirm the Commission's determination that both of these hazards qualify as other serious safety or health hazards, and render the PRCS standard applicable to the baler chamber.

OPS next contends that the Commission erred in affirming the ALJ's finding that the violations of the PRCS standard were "serious" as opposed to de minimis or "other than serious." We disagree. To demonstrate a serious violation of a safety standard under the Act, the Secretary must prove that the cited standard applies and that its requirements were not met, that employees were exposed to, or had access to, the violative condition, and that the employer knew or, through the exercise of reasonable diligence, could have known of this condition. D.A. Collins Constr. Co. v. Sec'y of Labor, 117 F.3d 691, 694 (2d Cir. 1997). Further, 29 U.S.C. § 666(k) requires that "there is a substantial probability that death or serious physical harm could result" from the hazard in order for a serious violation to exist.

---

[2]The Secretary's expert testified that turning the baler's power key to "off" would not eliminate the possibility of unexpected activation because this procedure was not an "energy-isolating device. It's just simply a control circuit. The control circuit is just telling some relays to drop out, but it's not actually withdrawing the main power from the unit." Sec'y of Labor v. Omaha Paper Stock Co., Docket No. 99-0353, Tr. at 121-22 (Oct. 13, 1999). He further testified that control circuits occasionally fail, and something as simple as a short-out in the circuit could suddenly energize the baler when it has only been locked out by a control circuit.

OPS's argument centers around the "knowledge" component of the serious violation elements, asserting that the violations could not be serious because OPS did not know that the baler chamber was a PRCS. The Commission found that OPS did not necessarily have to know the baler chamber was a PRCS and instead ruled that the Secretary need only establish that OPS knew of the dangerous conditions constituting a violation. Having reviewed the record, we find that the Commission's ruling in this regard is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Cf. Danco Constr. Co. v. Occupational Safety and Health Review Comm'n, 586 F.2d 1243, 1246-47 (8th Cir. 1978) (holding that employer had requisite "knowledge" for serious safety violation when it left inexperienced employees unsupervised near a dangerous power source). OPS certainly knew of the dangers inherent in the baler chamber, and also knew that one of the three employees on the temporary second shift was inexperienced and relatively untrained. Further, OPS reasonably could have known that employees were entering the baler chamber to clear jams. Tracy testified that he saw another employee climb into the baler a few days before his accident, and that he also had previously reached into the baler on the day of the accident. In light of these conditions, we find the knowledge component has been met.

Finally, OPS argues the Commission erred in not further abating the penalties imposed by the ALJ. We review the penalties assessed by the Commission for an abuse of discretion. Brennan v. Occupational Safety and Health Review Comm'n, 487 F.2d 438, 442 (8th Cir. 1973). The ALJ took into consideration the gravity of the violation, as well as OPS's size, history of previous violations, and lack of bad faith when determining the appropriate penalty. See 29 U.S.C. § 666(j). While the ALJ found the violations to be "moderate to high," the Commission determined that the gravity of violations was merely "moderate" and reduced the total penalties from $16,000 to $12,000. Considering our standard of review, we find no abuse of discretion.

## III.   CONCLUSION

We find that the Secretary has met his burden of establishing that the PRCS standard applied to OPS's baler chamber, that the standard was not met, that Tracy and other employees were exposed to the hazardous conditions of the baler chamber, and that OPS knew, or through the exercise of reasonable diligence, could have known of the hazardous conditions.  See D.A. Collins Constr., 117 F.3d at 694.  We also find that the Commission did not abuse its discretion in determining the applicable penalties.  The Commission's order is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.